UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG A EGER and JULI A EGER,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.18-cv-00199-DMR<br><br>**ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Docket Nos. 43 & 50 |

This case is about a tax dispute. Plaintiffs Greg and Juli Eger ("the Egers") challenge the Internal Revenue Service's ("IRS") decision to disallow an election they made on their federal income tax returns regarding three rental properties. They move for partial summary judgment. [Docket No. 43 (Pltfs' Mot.).][1] Defendant United States of America ("the Government") opposes, cross-moves for summary judgment, and moves to dismiss one claim based on lack of standing. [Docket No. 50 (Def.'s Opp'n & X-Motions).] The court heard oral argument on August 1, 2019. Having considered the parties' arguments and submissions, the court denies the Egers' motion for partial summary judgment and grants the Government's cross-motion for summary judgment and motion to dismiss.

**I.    MOTIONS FOR SUMMARY JUDGMENT**

**A.    Description of the Statutory Framework**

The facts of the case are described in detail below. In short, this dispute involves the Egers' 2007, 2008, and 2009 (the "Relevant Years") federal income tax returns. During the Relevant Years, Greg Eger met the requirements to claim status as a Real Estate Professional ("REP") under the tax

---

[1] Although the Egers styled their motion as seeking partial summary judgment, they confirmed at the hearing that there are no outstanding issues before the court outside the matters decided here.

code.[2]  The Egers owned numerous rental properties, including the three at issue here.  The Egers treated the three properties as "rental activity," which increased the total amount of business loss they sought to claim.  The IRS disallowed this approach, and the Egers filed this lawsuit to challenge the IRS's decision.

The parties' positions turn on a regulation promulgated under section 469 of the Internal Revenue Code.  Section 469 captures the "Passive Activity Limitations" ("PAL") rule, which limits a taxpayer's ability to deduct losses from businesses in which he or she does not materially participate, and from rental activities.  *See* 26 U.S.C. § 469(a)(1) (1986).  Thus, a passive activity is any activity that "involves the conduct of any trade or business . . . in which the taxpayer does not materially participate."  *Id.* § 469(c)(1).  Rental activity from properties also is typically considered passive activity.  *Id.* § 469(c)(2).  However, if the taxpayer qualifies as an REP, rental activity generally is not considered passive, and can be applied as non-passive loss against non-passive income.  *Id.* § 469(c)(7).

Rental activity is "any activity where payments are principally for the use of tangible property."  *Id*. § 469(j)(8).  The accompanying regulation defines "rental activity:"

> [A]n activity is a rental activity for a taxable year if—
> (A) During such taxable year, tangible property held in connection with the activity is used by customers or held for use by customers; and
> (B) The gross income attributable to the conduct of the activity during such taxable year represents . . . amounts paid or to be paid principally for the use of such tangible property (without regard to whether the use of the property by customers is pursuant to a lease or pursuant to a service contract or other arrangement that is not denominated a lease).

26 C.F.R. § 1.469–1T(e)(3)(i).

The regulation also sets forth seven exceptions to the definition of "rental activity."  The parties agree that their dispute centers on one of the exceptions, which states that the activity is not

---

[2] In order to determine whether a taxpayer is a REP, the person must establish that he or she materially participated in the real property trade or business by virtue of having devoted a certain number of hours to that work.  26 U.S.C. § 469(c)(7).  One spouse's time is sufficient to qualify both spouses as REPs when they file a joint tax return.  *Id*. § 469(h)(5).

rental activity if "[t]he average period of customer use for such property is seven days or less." 26 C.F.R. § 1.469-1T(e)(3)(ii)(A). A "period of customer use" is further defined as "[e]ach period during which a customer has a continuous or recurring right to use [the property]." 26 C.F.R. § 1.469–1(e)(3)(iii)(D).

The Government contends that this exception applies to the three properties at issue because the average period of customer use for each of them was seven days or less. *See, e.g.*, Def.'s Opp'n & X-Motions at 4. Under the Government's approach, the customers are the end-user guests who stayed in the rental properties. According to the Government, the IRS correctly determined that the three properties do not constitute rental activity because the end-user guests stayed an average of less than seven days. For their part, the Egers assert that the customers are the three management companies with whom the Egers had a contractual relationship. *See, e.g.*, Pltfs' Mot. at 12. Therefore, according to the Egers, the average period of customer use was far greater than seven days, which means that the exception does not apply, and they appropriately treated the three properties as rental activity in their tax returns.

### B. Stipulated Facts and Procedural History

The parties submitted a Joint Statement of Undisputed Facts [Docket No. 42 (JS).] At the hearing, they confirmed that there are no disputed facts that are material to the adjudication of these motions.

The Egers filed federal income tax returns for the Relevant Years. JS ¶ 2. During that time period, Greg Eger "render[ed] personal services solely in real property trades or businesses in which he materially participated," "devot[ing] more than 750 hours of services in each such year to such trades or businesses." *Id.* ¶ 3. For purposes of these motions, it is undisputed that Greg Eger qualifies as a REP under the tax code. Def.'s Opp'n and X-Motions at 2, n.1 ("The United States will assume, without conceding, for purposes of the Motion only that Plaintiffs were in the 'real property business' during the years at issue, and that they made a proper group election."). During the Relevant Years, the Egers owned rental properties in Mexico, Colorado, and Hawaii (the "Resort Properties"). For each of these properties, the Egers entered into management agreements, which are described below.

3

### 1. The Los Cabos, Mexico Property

In 2005, the Egers purchased Villas del Mar # 371 (the "Mexico Property") in Los Cabos, Baja California Sur, Mexico. JS ¶ 5. The Egers entered into a "2006 Consulting Agreement" with SH Consulting, LLC ("SH") to rent out and manage the property (the "Mexico Agreement"), pursuant to which SH was granted the "exclusive right to market [the Mexico Property, hereinafter "the Unit,"][3] to third parties for use." [Docket Nos. 43 (2-7), 44-48 (Declaration of Smith ("Smith Decl.")), Ex. 8 at ¶ 2.] As part of the agreement, the Egers elected to join a program called "Free Sell." Under the Free Sell program, SH would "black out any and all dates that [the Egers] do not wish to offer the Unit for use." *Id.* ¶ 3. The Egers could update the blackout dates at any time in writing, as long as there was not a conflicting confirmed reservation for the Unit. *Id.* SH agreed to use its efforts to market the Unit "for use by third parties on the Available Days," and was allowed to "enlist the services of one or more subcontractors or other third parties to assist SH in such efforts." *Id.* ¶ 6. SH was also entitled to request up to five complimentary nights from the Egers. *Id.* ¶ 7. SH would execute a "Use Agreement" with third-party guests who wanted to rent the Mexico Property, and could make changes to the Use Agreement as SH "deemed appropriate," except that SH could not change the daily use fee without the Egers' consent. *Id.* ¶ 8. SH was authorized to collect payment from third-party guests and allocate 70% to the Egers and 30% to SH, after subtracting service fees. *Id.* ¶ 9. The Egers occupied the Mexico Property for 13 nights in 2007, 12 nights in 2008, and 12 nights in 2009. JS ¶ 24.

### 2. The Avon, Colorado Property

In 2007, the Egers purchased a unit in Bachelor Gulch Village in Avon, Colorado (the "Colorado Property"). JS ¶ 10. The Egers entered into a "Rental Program Agreement" (the "Colorado Agreement") with Bachelor Gulch Operating Company, LLC, which was labeled as "Resort Owner" in the agreement. Smith Decl., Ex. 15. Pursuant to the Colorado Agreement, the Resort Owner owned the resort under the Ritz-Carlton name. *Id.* at 1. The Egers could elect to place their property into a "voluntary rental program" to rent the Unit to "guests of the Resort." *Id.*

---

[3] All the agreements refer to each property as "the Unit." Any references to "the Unit" are with respect to the property being discussed.

By opting into the rental program, the Egers allowed the Resort Owner to "act as the sole and exclusive rental agent to offer the Subject Unit for rental." *Id.* The Colorado Agreement granted the Resort Owner "the exclusive authority to rent, operate and manage the [] Unit as agent of Unit Owner." *Id.* at 2. The rental program placed the Unit in a rotating unit reservation system "designed to fairly and equitably allocate Unit reservations and occupancy among Participating Units." *Id.* The Resort Owner was responsible for "rent[ing] the [] Unit to Resort Guests on a transient basis for and on behalf Resort Owner (sic) and [the Egers]," and for collecting the owed amounts from the guests. *Id.* at 3. The Resort Owner would also help market the Unit; provide a central reservation system for the entire Resort and process all reservations received through this system; and negotiate all terms and conditions including setting room rates, negotiating group rates, and offering incentives to prospective guests. *Id.* The Resort Owner was responsible for setting the rental rate for the Unit and could modify the rate at its "sole and absolute discretion." *Id.* at 7. The Resort Owner was also entitled to seven complimentary nights, to be used at its discretion. *Id.* The Egers had the right to use the property subject to several restrictions. First, they were allowed to request the Unit for up to 56 nights in a calendar year. *Id.* at 8. Anything beyond the 56 nights would be subject to an additional fee owed to the Resort Owner. *Id.* at 5. The Egers could not reserve the Unit more than 365 days in advance. *Id.* at 8. If the Egers were to reserve their Unit, they would have to register at the Resort. *Id.* at 9. If any guests were to stay with them in their Unit, they would have to notify the Resort Owner of the names and occupancy dates of all guests no less than 15 days prior to the date of arrival of any such guest(s). *Id.* The Egers could not accept payment or other consideration for the use of the Unit during any nights on which they decide to use the Unit. *Id.* They could not enter the Unit without prior notification, approval from, or coordination with the Resort Owner, and could not make alterations to the Unit. *Id.* at 11-12. The Egers never occupied the Colorado Property during the Relevant Years. JS ¶ 25.

### 3. The Maui, Hawaii Property

In 2008, the Egers purchased a condominium unit in Maui, Hawaii (the "Hawaii Property"). JS ¶ 16. They entered into a "Rental Program Agreement" (the "Hawaii Agreement") with Honolua Associates, LLC to rent out and manage the property for the Egers. Smith Decl., Ex. 28. Pursuant

5

to the Hawaii Agreement, the management company became the exclusive rental agent, and agreed to "endeavor to offer for rent" the Unit "to Resort Guests on a transient basis for and on behalf of [the Egers]." *Id.* at 4. As with the Colorado Property, the management company was responsible for collecting room rental from guests and marketing the Unit under the Ritz-Carlton name. *Id.* at 5. Indeed, the Hawaii Agreement is substantially similar to the Colorado Agreement, with two notable differences. First, unlike the Colorado Property, there was no limit on the number of nights the Egers could reserve the Hawaii Property, except that in the initial six months the Egers were subject to a 30-night cap. *Id.* at 10-11. Second, the Egers had to reserve use of the Unit at least 180 days in advance, *id.*, while the Colorado Agreement required that they make reservations no earlier than 365 days in advance. The Egers never occupied the Hawaii Property during the Relevant Years. JS ¶ 26.

### 4. Procedural History

In all Relevant Years, the Egers claimed an election on their federal income tax returns that grouped their 33 rental properties, including the three Resort Properties, as a single rental real estate activity. JS ¶ 4. On September 30, 2013, the Egers filed amended income tax returns seeking a refund for the Relevant Years. *Id.* ¶ 38. On August 9, 2016, the Commissioner of Internal Revenue ("C.I.R.") denied their claims. *Id.* ¶ 39. "In rejecting Plaintiffs' refund claims, the [C.I.R.] disallowed Plaintiffs' treatment of their interests in the Resort Properties as real estate rentals that could be grouped into their real estate rental activity." *Id.* ¶ 40. The C.I.R. rejected the argument that the agreements constituted leases, and instead characterized them as "marketing agreements," which were entered into for:

> [t]he purpose[s] of . . . provid[ing] . . . compensation to the Agent, set[ting] parameters for what the Agent can and cannot do, provid[ing] for a termination clause and creat[ing] a period during which the contract would be in force. . . . A review of the management agreements confirms the payments are being made by the taxpayer to the management companies for services provided. The argument that the contract stipulates a lease is without support in the facts and has no merit in the law. The taxpayer's argument that the management contracts constitute sub-leases of the properties to the management companies is not supported by the facts.

Smith Decl., Ex. 1 (June 14, 2016 Written Decision by C.I.R.). The C.I.R. also assessed accuracy-

6

related penalties against the Egers. JS ¶ 42. They were given the option of appealing the decision before a federal court of claims or a federal district court within two years of the decision. Smith Decl., Ex. 43 at 1.

The Egers timely filed their complaint before this court on January 9, 2018. They seek a refund of taxes and penalties incurred. [Docket No. 1 (Complaint) at 4 (Prayer for Relief).]

### C. Legal Standard for Summary Judgment

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Where, as here, the parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "In fulfilling its duty to review each cross-motion separately,

the court must review the evidence submitted in support of each cross-motion." *Id.*

In a tax refund case, the taxpayer bears the burden of establishing entitlement to a deduction under the Internal Revenue Code. *Maciel v. C.I.R.*, 489 F.3d 1018, 1028 (9th Cir. 2007); *Talley Indus. Inc. v. C.I.R.*, 116 F.3d 382, 387–88 (9th Cir. 1997); *Norgaard v. C.I.R.*, 939 F.2d 874, 877 (9th Cir. 1991). "If evidence to establish a deduction is lacking, the taxpayer, not the government, suffers the consequence." *Talley Indus.*, 116 F.3d at 387–88.

**D.     Analysis**

    **1.     Mixed Question of Law and Fact**

As a threshold matter, the court must determine whether it is appropriate to decide this dispute as a matter of law, or whether the issues are better suited for a trier of fact. The parties agree that the material facts are undisputed, but they disagree on the import of those facts as applied to the law, which makes this a mixed question of law and fact. *See, e.g.*, *Parkside, Inc. v. CIR*, 571 F.2d 1092, 1094 (9th Cir. 1977) (noting that a tax court's determination of whether taxpayers were allowed to claim a tax exemption is a "question of fact arguably mixed with law"). Courts have found that "[w]here a case turns on a mixed question of law and fact and . . . the only disputes relate to the legal significance of undisputed facts, 'the controversy collapses into a question of law suitable to disposition on summary judgment.'" *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1115 (9th Cir. 2011) (quoting *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003)); *see also Bellco Credit Union v. United States*, 735 F. Supp. 2d 1268, 1276-77 (D. Co. 2009) ("[W]here a decision is likely to have significant precedential impact on the resolution of an issue imbued with the need for consistency and reasoned resolution, the balance tilts toward determination by the judge rather than the jury.").

The court finds, and at the hearing the parties agreed, that the matter is proper for summary judgment because it presents a dispute about the legal significance of undisputed facts. *See, e.g.*, *Merchants Refrigerating Co. of California v. United States*, 659 F.2d 116, 116-17 (9th Cir. 1981) (affirming a district court's summary judgment determination of whether certain real properties could be claimed under a particular tax exemption, which was a question involving a mix of fact and law).

8

### 2. Whether the Management Companies Had a "Continuous or Recurring Right to Use" the Resort Properties

Both parties agree that Greg Eger qualified as a REP during the Relevant Years, and the Egers were thus permitted to group similar real estate properties together as "rental activity." It is also undisputed that the Egers were allowed to group the rental activity for purposes of calculating their non-passive losses which they could then deduct from their non-passive income. The sole issue before the court is whether the Egers could group the Resort Properties with their other real estate properties as a single rental activity for purposes of section 469.

The Government argues that the Tax Commissioner correctly disallowed this approach by finding that the Resort Properties could not properly be claimed as "rental activity" because the average period of customer use of the end-user guests was less than seven days. According to the Government, the Resort Properties therefore fall under that exception to the governing definition of "rental activity." In contrast, the Egers argue that, for the purposes of determining whether the average period of customer use was less than seven days, the "customers" were the three management companies, because a period of customer use is defined as "each period during which a customer has a continuous or recurring right to use [the property]." *See* 26 C.F.R. § 1.469-1(e)(3)(iii)(D). According to the Egers, each of the management companies had periods of continuous or recurring right to use the Resort Properties that lasted over seven days pursuant to the terms of the management agreements. Boiled down to its core, the parties' dispute turns on whether the management companies had "continuous or recurring" rights to use the Resort Properties pursuant to 26 C.F.R. § 1.469.

The court finds that the three management companies did not have a continuous or recurring right to use the Resort Properties because the Egers retained significant rights to use the properties throughout the Relevant Years. *See* Smith Decl., Ex. 15 (Colorado Agreement) at 8-9 (right to use the property up to 56 nights a year); Ex. 8 (Mexico Agreement) at 2 (right to use the property at any time, as long as the property was not already booked by a guest); Ex. 28 (Hawaii Agreement) at 10-12 (right to use the property with at least 180 days' advance reservation).

//

//

9

### a. Continuous Use

The Egers primarily rely on two cases to support their proposition that the management companies are customers who had "continuous" use of the Resort Properties. In both cases, the court calculated the period of continuous or recurring use based on the use by the property management companies rather than that of the end-users. First, the Egers cite *White v. C.I.R.*, which is a tax court case involving taxpayers who owned a sailboat and entered into an agreement with a charter company named AYC. T.C. Summ. Opp. 2004-139, 2004 WL 2284383 (2004). The agreement gave AYC the exclusive right to lease the sailboat, and to then sublease it to third-party charterers without the taxpayers' involvement. *Id.* at *1-3. The tax court found that the taxpayers' agreement with AYC constituted rental activity because the agreement gave AYC "possession, dominion, and control" over the sailboat, as well as the "exclusive right to sublease." *Id.* at * 5. The court also noted that the taxpayers expressly acknowledged in the agreement that they reserved no right to charter the sailboat for their own nonbusiness private use, and that if the taxpayers wanted to lease the boat, they would have to pay AYC a commission, albeit a reduced one. *Id.*

Similarly, the Egers point to *Hairston v. C.I.R.*, in which the property consisted of heavy equipment owned by the taxpayers. T.C. Memo. 2000-386, 2000 WL 1862902, at *1-2 (2000). The taxpayers owned and operated a company named Hairston and entered into a lease agreement with Hairston regarding the equipment; the lease had an indefinite term and extended over a number of years. *Id.* at *1. Under the agreement, Hairston subleased the equipment to end-users and assumed "all responsibility" for the service, maintenance, taxes and insurance for the equipment. *Id.* The tax court found that the average period of customer use should be determined by the length of the agreement between the taxpayers and Hairston, and not the length of end-user subleases. In so holding, the tax court noted that the equipment was "available for use and sublease by Hairston at all times throughout each year." *Id.* at *2.

*White* and *Hairston* are distinguishable from this case because the taxpayers in those cases entered into contracts that conveyed exclusive access to their properties, including the right to rent to third party end-users. *See White*, 2004 WL 2284383, at *5; *Hairston*, 2000 WL 1862902, at *2. The taxpayers in *White* and *Hairston* did not retain any rights to use their properties throughout the

10

duration of the agreements.[4] By contrast, the Egers retained significant rights to use the Resort Properties and therefore did not convey exclusive access rights to the management companies.

The Egers respond that "continuous" use should be determined by examining the actual course of conduct. Specifically, they argue that the management companies' use of the Colorado and Hawaii Properties was continuous because the Egers never used those properties during the Relevant Years.[5] This argument fails. The plain language of the regulation directly contradicts the Egers' argument because it defines a period of customer use as a period "during which a customer has a continuous or recurring *right to use* an item of property held in connection with the activity (without regard to whether the customer uses the proper for the entire period . . . .)." 26 C.F.R. § 1.469-1(e)(3)(iii)(D) (emphasis added). Thus, a period of customer use is defined by the right to use the property, not its actual use.

The Egers also cite *Moreno v. United States*, arguing that it stands for the proposition that having the "exclusive power[] to lease [a property]" is indicative of having a continuous right to use it. Pltfs' Mot. at 12-13 (citing and discussing *Moreno v. United States*, 12-cv-2920, 2014 WL 2112864 (W.D. La. May 19, 2014)). In *Moreno*, the plaintiff taxpayer owned an aircraft that it leased out to six entities during the relevant tax year. 2014 WL 2112864, at *1. The leases permitted each lessee to request to use the aircraft, but the taxpayer retained the right to approve or deny any flight scheduling request at his sole discretion. *Id.* at *12. The leases were non-exclusive in the sense that all lessees had the same right to request the aircraft during the term of the leases. *Id.* at *13. The government argued that the lease agreements gave each lessee a "continuous and recurring right to use the Aircraft from the time each agreement was entered into, through the end of the

---

[4] The Egers also argue that *White* supports their interpretation because the agreement precluded the taxpayer from using the yacht for "nonbusiness private" use only. They urge the court to infer that the taxpayer was not precluded from using the yacht for commercial use, and that therefore the agreement did not vest AYC with exclusive access to the yacht. The court declines to speculate about what other terms may have been in that agreement that were not expressly discussed in the opinion.

[5] At the hearing, the Egers conceded that because they actually used the Mexico Property throughout the Relevant Years, the management company did not have "continuous" use. However, they argue that the management company had recurring use of the Mexico property. That argument is addressed below.

11

[relevant] taxable year . . . ." *Id.* The court disagreed. It found that the lessees had no right to use the aircraft until their flight scheduling request was approved. *Id.* at *13-14. All the lease itself provided was "a continuous and recurring *right to request*" to lease the plane. *Id.* at *14 (emphasis added). Thus, the court held that each lessee only had a "continuous and recurring *right to use*" the plane when it had actual possession of it. *Id.* at *14 (emphasis added). Since the average period of such use was less than seven days, the court held that the activity at issue was not rental activity. *Id.*

The Egers make a convoluted and illogical argument about how *Moreno* supports their position. It goes like this: in *Moreno*, the lessees had no rights to use the plane outside of their actual possession, and therefore did not have continuous right to use the plane at other times. Further, no lessee had the exclusive right to request the plane because the taxpayer had similar contracts with the other lessees for the same time. The Egers argue that, by contrast, the management companies in this case retained significant rights to use the Units at all times and contracted exclusively with the Egers.[6] This supposedly shows that the management companies have a continuous right to use the Resort Properties. This does not follow. The absence of the factors that the court in *Moreno* considered relevant does not mean that the inverse conclusion is true here.[7] Accordingly, *Moreno* does not support the Egers' position nor does it contradict the analysis in this case.

The language of the management agreements lend support to the court's conclusion that the management companies were not customers who had a continuous right to use the Resort Properties. Rather, the management companies provided marketing and rental services for the Egers to rent out the Resort Properties. The agreements state in relevant part that the companies entered into contracts

---

[6] The Egers also argue that *Moreno* shows that the management companies of the Resort Properties in this case are the Egers' customers. This is beside the point. The key question is not whether the management companies are the Egers' customers, but whether the management companies had "continuous or recurring" use of the Resort Properties for an average of more than seven days.

[7] This type of logical fallacy is known as "denying the antecedent," or "inverse error." The argument goes as follows: "If A, then B. Therefore, if not A, then not B." The Egers' argument is a variation on this type of false reasoning. Their argument about *Moreno* is (A) because the lessees' contracts in that case were not exclusive, then (B) there was no continuing use; therefore (A) because the management companies' contracts with the Egers were exclusive, then (B) there was continuing use here.

12

to rent out the Resort Properties on behalf of the Egers. Smith Decl., Ex. 8 at 1 (allowing the company "exclusive right to market [the Mexico Property] to third parties for use"); Ex. 15 (Colorado Agreement) at 3 (the company was responsible for "rent[ing] the [] Unit to Resort Guests on a transient basis for and on behalf [of the management company] and [Plaintiffs]"); Ex. 28 (the Hawaii Agreement) at 4 (company provide the service of "endeavor[ing] to offer for rent" the property "to [end-user guests] on a transient basis for and on behalf of [Plaintiffs]).[8]

In sum, the record demonstrates that the management companies did not have the continuous right to use the Resort Properties.

### b. Recurring Use

The Egers also fail to establish that the average period of customer use should be determined by examining the management companies' "recurring right" to use the Resort Properties. In their reply brief, the Egers argue for the first time[9] that in determining the period of customer use, the court should not focus solely on "continuous" use of the Resort Properties, because the regulation is stated in the disjunctive, i.e., a "period of customer use" is defined as "each period during which a customer has a continuous *or* recurring right to use [the property]." 26 C.F.R. § 1.469-1(e)(3)(iii)(D) (emphasis added). The court agrees that the disjunctive language of the regulation necessarily means that the relevant period of customer use can be demonstrated through either the continuous or recurring right to use the property.

The Egers do not present a separate argument on the nature of a "recurring" right; they

---

[8] At the hearing, the parties represented that the court need not analyze each agreement separately to examine the varying degrees of control that they vested in the management companies over items such as whether the Resort Properties could be physically changed, requirements for check-in procedures, and the setting of room rates. According to the parties, such aspects are irrelevant to the analysis because the Egers' argue that the tightly controlled "right to rent" the respective Resort Properties is equivalent to a "right to possess" them, which in turn amounts to a "continuous or recurring right to use" the properties. Since all parties contend that the contractual differences about the degree of control over the properties are irrelevant, the court will not analyze them.

[9] The Egers originally argued that the managing companies maintained a "continuous *and* recurring right" to use the Resort Properties, without distinguishing between the two. Pltfs' Mot. at 12 ("Plaintiffs conferred on each management company a 'continuous and recurring right' to possession of its respective Resort Property for the entirety of each taxable year."). The court would be well within its discretion in refusing to consider a new argument raised for the first time on reply. The court nevertheless will consider the argument in the interest of reaching a fully informed determination on the merits.

merely reassert the same argument regarding the existence of a "continuous" right, namely that the management companies' exclusive control over renting out the Resort Properties amounts to a "recurring" right to use them. This fails for the same reasons set forth above. Thus, the Egers have failed to meet their burden to show that the managing companies had a "recurring" right to use the Resort Properties.

Finally, as noted by the Government, even if the court were to find that exclusive control over the right to rent out the Resort Properties constitutes a "recurring right" to use them, the Egers have not demonstrated that the average period of customer use is more than seven days for each of them. This is because the Egers' retained rights to use the Resort Properties throughout the Relevant Years exceed the seven-day average as a simple mathematical proposition. Specifically, the Egers retained the right to use the Mexico and Hawaii Properties for an unlimited number of days. With respect to the Colorado Property, the Egers retained the right to use it for up to 56 nights, which results in an annual average period of use of less than seven days. The Egers again respond that the court should look to actual conduct to determine whether the managing companies had a recurring right. They point to the fact that they never used the Colorado and Hawaii Properties, and only exercised their right as to the Mexico Property for a few nights each year. According to the Egers, by those calculations, the management companies' recurring use would be more than an average of seven days per year. This "actual conduct" argument fails here for the same reasons as discussed above, because the regulations clearly discuss a *right to use* the property, rather than actual use. In sum, the Egers have not provided legal or factual support for their position that the management companies had a "recurring right to use" the Resort Properties.

In sum, the Egers have not met their burden of demonstrating that the management companies had either a continuous or recurring right to use the Resort Properties. The court therefore denies the Egers' motion for partial summary judgment and grants the Government's cross-motion for summary judgment.

## II. MOTION TO DISMISS THE EGERS' PENALTY CLAIM

The Government separately moves to dismiss the Egers' claim seeking relief regarding the penalties assessed against them. It argues that the Egers do not have standing to challenge the

14

1 penalties because they have not yet paid them.

2 "Ordinarily, there is no jurisdiction in the district courts over suits for the refund of penalty amounts paid until the taxpayer has paid the *full amount* of the contested penalty assessment." *Thomas v. United States*, 755 F.2d 728, 729 (9th Cir. 1985) (citing *Flora v. United States*, 357 U.S. 63 (1958), *aff'd on rehrg*, 362 U.S. 145 (1960)). The Egers concede that their challenge is premature because they have not yet paid the penalties. Pltfs' Opp'n & Reply at 11 ("Plaintiffs acknowledge the United States' assertion that a taxpayer must first pay an accuracy-related penalty before having standing to challenge its imposition. Plaintiffs agree that their claim for refund of 26 U.S.C. § 6662 taxpayer-accuracy penalties is premature in that Plaintiffs have not paid any portion of such penalties."). They also do not identify or argue that any exception to the rule would apply here. *See Thomas*, 755 F.2d at 729-30 (discussing the application of an exception to the "full payment rule"). The court therefore grants the Government's motion to dismiss the penalty claim without prejudice.

## III. CONCLUSION

For the foregoing reasons, the court grants the Government's motion for summary judgment, and denies the Egers' motion for partial summary judgment. The court also grants the Government's motion to dismiss the penalty claim without prejudice. The court instructs the Clerk of Court to enter judgment in favor of the Government and close the case file.

**IT IS SO ORDERED.**

Dated: August 30, 2019



Donna M. Ryu
United States Magistrate Judge